# ORIGINAL

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| In re:<br><br>ALLEN BEAL,<br><br>        Debtor.<br>——————————————————————<br>STATE BANK OF SOUTHERN<br>UTAH, a Utah banking<br>corporation,<br><br>        Plaintiff<br><br>        vs.<br><br>ALLEN BEAL,<br><br>        Defendant/Debtor. | ) <br>) <br>) <br>) Evidentiary Hearing<br>) on Motion to Extend<br>) Time for Filing<br>) Adversary Proceeding,<br>) and Motion to Strike<br>) <br>) Case No. 19-20276<br>) <br>) Volume 2<br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) |

October 24, 2019 * 1:01 p.m.

OFFICIAL TRANSCRIPT OF ELECTRONIC RECORDING

Reporter:  Dawn M. Perry, CSR

172

236 SOUTH 300 EAST
SALT LAKE CITY, UT 84111

WWW.CITICOURT.COM



801-532-3441
FAX: 801-532-3414

INFO@CITICOURT.COM

1                  A P P E A R A N C E S

2     FOR THE DEFENDANT/DEBTOR:

3                Will Morrison
                 Attorney at Law
4                Morrison Law Office
                 5957 S. Redwood Road
5                Suite 101
                 Salt Lake City, Utah  84123
6                (801) 519-9772
                 willmorrison01@gmail.com
7
      FOR THE PLAINTIFF:
8
                 Steven W. Call
9                Attorney at Law
                 Ray, Quinney & Nebeker
10               36 S. State Street
                 Suite 1400
11               Salt Lake City, Utah  84111
                 (801) 532-1500
12               (801) 532-7543 (fax)
                 scall@rqn.com
13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              I N D E X

 2                                            PAGE

 3  JANENE TANNER

 4  Direct Examination by Mr. Call            107

 5  Cross-Examination by Mr. Morrison         133

 6  Redirect Examination by Mr. Call          143

 7  RUSSELL JONES

 8  Direct Examination by Mr. Call            146

 9  Cross-Examination by Mr. Morrison         158

10  Redirect Examination by Mr. Call          160

11  GARY GFELLER

12  Direct Examination by Mr. Call            161

13  Cross-Examination by Mr. Morrison         184

14  Redirect Examination by Mr. Call          213

15

16                  * * *

17

18

19

20

21

22

23

24

25
```



1                     E X H I B I T S

2

3    NO.                    DESCRIPTION              PAGE

4
     16    Daily Log                                 186
5
     17    Demand                                    186
6
     18    Timeline                                  186
7

8                         * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              P R O C E E D I N G S

 2

 3              THE CLERK:  Please be seated.

 4              In the matters of State Bank of Southern

 5    Utah versus Beal and Allen Beal.

 6              THE COURT:  Why don't we get appearances

 7    of counsel again today, okay?

 8              MR. CALL:  Steve Call appearing on behalf

 9    of State Bank of Southern Utah.

10              MR. MORRISON:  Will Morrison for Mr. Beal.

11              THE COURT:  All right.  Mr. Call, do you

12    wish to call another witness?

13              MR. CALL:  I do.  I -- I would ask to call

14    Janene Tanner.

15              THE CLERK:  Raise your right hand.

16              (Witness sworn.)

17              THE CLERK:  Have a seat at the witness

18    stand.  State and spell your name for the record,

19    please.

20              MS. TANNER:  Janene Tanner.  J-a-n-e-n-e,

21    T-a-n-n-e-r.

22                    JANENE TANNER,

23         called as a witness, being first sworn,

24          was examined and testified as follows:

25
```



                        EXAMINATION

BY MR. CALL:

1    Q.    Good afternoon, Janene.

2    A.    Hi.

3    Q.    Could you tell us what your position is
here at the court?

4    A.    I am a CM/ECF administrator.  So I'm over
the electronic filing system.  Make sure everything
is running properly for the attorneys.  And I do some
of the attorney training.

5    Q.    Okay.  And how long have you been doing
that?

6    A.    Well, I've been with the court for 30
years, but probably ten years as the CM/ECF
administrator.

7    Q.    And prior to giving your testimony today,
have you spoken with anyone else about what you would
be testifying to today?

8    A.    My chief deputy, but...

9    Q.    Okay.  And who is that?

10   A.    Gary Gfeller.

11   Q.    Okay.  Have you reviewed any documents in
preparing for your testimony today?

12   A.    Not really, no.

13   Q.    Okay.  So do you -- you handle what's



1  called the help desk?

2       A.    Yes, I do.

3       Q.    Okay.  And attorneys contact you by phone

4  or e-mail to -- when they have questions --

5       A.    Yes.

6       Q.    -- or problems?

7       A.    Yes.

8       Q.    Okay.  And how frequently do calls come

9  in?

10       A.    It depends on the day.  Today's been

11  rather quiet.  I've had a couple calls.  So depending

12  on the issues that the attorneys are having.  So it

13  varies from day to day.

14       Q.    And do -- do the -- are there more e-mails

15  that come in than calls, or more calls?

16       A.    I would say more calls than e-mails 'cause

17  usually they want some -- an instant answer to the

18  issue.

19       Q.    Okay.  And you're familiar with the log-in

20  process that filers use in making a filing with the

21  bankruptcy court?

22       A.    Yes.  Uh-huh.

23       Q.    Okay.  And are you familiar with the

24  different types of browsers that are used to log into

25  the filing system?



1      A.     Yeah, I'm familiar with them.

2      Q.     And do many of the users that file in --

3   or that log in and file documents with the bankruptcy

4   court, do they use Google Chrome?

5      A.     Several of them do, yes.

6      Q.     So there shouldn't be a problem with an

7   attorney logging into the system to make a filing

8   using Google Chrome?

9           MR. MORRISON:  Object -- sorry.  I was

10  going to object.  It calls for evidence that is --

11  hasn't been presented, and I believe she lacks

12  foundation, but...

13          MR. CALL:  Well, I think it has been

14  presented in evidence and -- we have had Exhibit 15

15  admitted and there was testimony concerning the

16  browser.

17          THE COURT:  I'm going to overrule the

18  objection.

19     Q.     (BY MR. CALL)  Okay.  Would you look at

20  what's been marked as Exhibit 15?

21     A.     Okay.

22     Q.     Okay.  I'll indicate to you that that is

23  the version of the browser that I, as Bank counsel,

24  used on April 22nd of this year to log into the

25  system.



1              You don't have any understanding that --
2    that using what was the most current version of
3    Google would have been a problem at that time, do
4    you?
5         A.    No.
6         Q.    In fact, wouldn't it have been normal
7    for -- wouldn't you have expected that a -- that a
8    user would use a more current version of a browser?
9         A.    I don't know as far as a current version,
10   but -- 'cause everybody's systems are a little bit
11   different on what they've upgraded to, so...
12        Q.    Okay.  Did -- did you receive a call from
13   Carrie Hurst on the morning of April 23rd?
14        A.    Yes, I did.
15        Q.    And did she report to you that there had
16   been some problems with a filing -- attempted filing
17   the evening before?
18        A.    She reported that, but it was my
19   understanding that it was mostly that the payment
20   couldn't be made.
21        Q.    Okay.
22        A.    So I told her how to go about making a
23   payment.
24        Q.    Okay.  And -- and what did -- how did you
25   tell her to make the payment?



1    A.    Normally if the attorney doesn't pay the

2    fees that day, if they log into their filing account,

3    the payment window comes up for them to pay.

4          Or there's another avenue; they can go

5    into utilities and there is an option, Internet

6    Payments Due, and they can select that and make their

7    payments that way.

8    Q.    And was that payment made?

9    A.    Yes, it was.

10   Q.    And was that approximately 9:00?

11   A.    It was -- yeah, roughly around that time.

12   Yes.

13   Q.    Was it?

14         Would you look at Exhibit -- the Bank's

15   Exhibit Number 10?

16   A.    Okay.

17   Q.    Do you see that notification?

18   A.    Uh-huh.

19   Q.    Can you describe what that is?

20   A.    Well, it looks like the e-mail

21   notification.  It says it's coming from PayServ,

22   that -- that the transaction went through.

23   Q.    Okay.

24   A.    The payment of 350 for the --

25   Q.    And when you say PayServ, are you



1    referring to Pay.gov?

2         A.    Oh, not PayServ.  Yes, Pay.gov.  I'm

3    sorry.

4         Q.    Okay.  And is the normal payment procedure

5    with -- with Pay.gov?

6         A.    Yes, it is.

7         Q.    And is that a different system than the

8    EMC [sic] system?

9         A.    Yes, it's totally different from the

10   filing system.

11        Q.    Okay.  And so when someone is using the

12   EMC system, if a payment's to be made that then --

13   isn't that payment required to be made through

14   Pay.gov?

15        A.    Yes, it is.

16        Q.    And if Pay.gov were not working properly

17   for some reason, what would occur if a filing -- let

18   me back up and restate that.

19             If a -- if a filer was attempting to make

20   a payment of $350, let's say, to open an adversary,

21   and if the window did not come up, then what -- what

22   would a user do at that time, do you know?

23        A.    I don't know -- well, they would have

24   to -- they -- if it didn't come up, they would

25   need -- probably call the court.  But I don't know



1    that I've seen the pay window not come up when a

2    fee's incurred with -- with any debt that's being

3    filed.

4         Q.    Okay.  So let me -- let me show you here

5    what's marked as Exhibit 3.  And we have it as the

6    Bank's Exhibit 3.  It's on a board here.

7         A.    Yes.

8         Q.    Can you see that okay?

9         A.    Uh-huh.

10        Q.    Okay.  You're familiar with that --

11        A.    Yes.

12        Q.    -- screen?

13        A.    Right.

14        Q.    Okay.  And is it your -- can you explain

15   to the Court and to me what that screen represents?

16        A.    Well, it's just one of the steps in the

17   opening of an adversary case that that fee window

18   will come up indicating how much is -- will be due

19   after the Complaint is totally filed.

20        Q.    Okay.

21        A.    So that's just basically an information

22   screen.

23        Q.    Okay.  And so if -- if a user files the

24   next screen there on -- or the Next button there --

25              THE COURT:  Did you say Exhibit 3?  I



1   can't see the lower corner of it.

2              UNIDENTIFIED SPEAKER:  Page 20.

3              THE COURT:  All right.  So Exhibit 3,

4   page 20, is the one Ms. Tanner just testified to.

5   Okay.

6        Q.    (BY MR. CALL)  So at this stage of a

7   filing, where it says Open Adversary Proceeding, if a

8   user were to put -- push the Next button, is it your

9   understanding that the Pay.gov should open up so that

10  payment can be made, or what's your understanding?

11       A.    No, it -- it doesn't show up there.  I

12  don't know exactly what the next screen is, but it's

13  always been, with CM/ECF that the filing gets

14  completely done before the fee is taken -- or

15  incurred.

16             And then being able to pay after the fee

17  is -- or being paid after the case has been opened --

18  or the adversary proceeding -- the fee window's

19  there.  That way, when you click on the pay window,

20  it will take you out to Pay.gov so that you can make

21  that fee payment.

22       Q.    Okay.  So if a user reaches this stage of

23  the filing process and clicks Next and it doesn't

24  proceed to the next window, would that indicate that

25  the system was not working correctly?



1      A.    It's possible.

2      Q.    Okay.  Is there any other explanation?

3      A.    Well -- I mean, I don't know.  I mean --

4  but -- if you hit the next window -- I mean the Next

5  button you're going to -- well, get another screen.

6  And I'm assuming that if it didn't -- you couldn't

7  get to the Next button, the system would throw up an

8  error that is, you know, some kind of an issue.

9      Q.    Okay.  Are you familiar with the demand

10  window screen in the filing --

11      A.    Yes.

12      Q.    -- of -- of an adversary proceeding?

13      A.    Yes.  Uh-huh.

14      Q.    Okay.  And do you -- do you see Exhibit 3

15  here that's blown up on the left side?

16      A.    Yes.

17      Q.    I don't have the page number, but it's

18  part of Exhibit 3.  And do you see there where it

19  says "demand" and then it has parentheticals with a

20  dollar sign and three zeros?

21      A.    Yes.  Uh-huh.

22      Q.    Okay.  And is it -- is there anything on

23  this page or anywhere -- well, on this page that

24  would indicate that the dollar sign -- well, let me

25  just ask you.  What's your interpretation of how --



1  looking at that document, what's your interpretation

2  as to how a demand amount would be entered into that

3  box?

4        A.    Well, I'm familiar with the CM/ECF system.

5  So depending on what your demand amount is on your

6  complain -- I mean on your Complaint, then you would

7  put in the figures.  It's, say, you know 150,000, you

8  just put in 150, because the system already -- the

9  system is set up to add the rest of the three zeroes.

10       Q.    Okay.  And what about -- doesn't it

11  indicate within the parenthetical there that a dollar

12  sign is to be added?

13       A.    Well, I don't know if that's the

14  assumption to be made.  I mean, when we were trained

15  it's -- we didn't put in the dollar sign.

16       Q.    But on -- but on this page you wouldn't

17  dispute that -- I mean, it's pretty clear from its

18  face that the dollar sign was within the

19  parenthetical.

20       A.    Well, it's within the parenthetical.

21       Q.    Okay.  Are you aware of errors that occur

22  if someone puts in a dollar sign before a demand

23  amount?

24       A.    Yeah, there's a -- yeah.  You'll get an

25  error.



1    Q.    Okay.  So it's your testimony, then, that

2    if the dollar sign is placed in front of a demand

3    amount that you will not -- that a user is not able

4    to proceed to the next screen?

5    A.    Right.

6    Q.    Okay.  Do you know why -- has there ever

7    been a discussion about correcting that parenthetical

8    to show the dollar sign outside of the parenthetical

9    or to add something indicating that no dollar sign

10   should be added?

11   A.    Maybe there's been discussions, but when

12   the system was created, the dollar sign automatically

13   is just populated.  So a user doesn't have to even

14   input that.

15   Q.    So is there --

16        THE COURT:  Mr. Call, I think we may need

17   some foundation about this system.  Your questioning

18   suggests that this is a program created by this

19   court, right?

20        MR. CALL:  No, I -- it -- my understanding

21   is that it's -- well, not created by the court but

22   it's --

23        THE COURT:  Well, you asked Ms. Tanner if

24   there's ever been any discussions about changing that

25   system, suggesting that she somehow has the ability



1  to even have input into that.

2           MR. CALL:  Oh.

3           THE COURT:  So I'm -- what I'm saying is

4  without the foundation, I think the questioning can

5  be confusing, because the way I heard the question

6  was that she had the ability to somehow alter this

7  program.

8           MR. CALL:  Well, can I clari --

9           THE COURT:  Yes.

10          MR. CALL:  Let me clarify.

11     Q.    So, Janene, you don't have the ability to

12  alter the screens that we've been discussing, do you?

13     A.    No.  This was a program created by our

14  administrative offices, so no.

15     Q.    Not the administrative offices here --

16     A.    No.

17     Q.    -- within --

18     A.    In Washington, D.C.

19     Q.    In Washington, D.C.

20     A.    It's used all over the country, CM/ECF.

21     Q.    And do you make recommendations

22  occasionally to the administration office?

23     A.    Occasionally -- occasionally there's been

24  recommendations all around the country --

25     Q.    Okay.



1        A.     -- for things to -- maybe to approve on.

2        Q.     Has there been a recommendation with

3   respect to the demand screen?

4        A.     Not that I'm aware of.

5        Q.     Let me ask you about commas.  Are you

6   aware that if a demand amount is put in and a comma

7   is put in whether or not the system would advance?

8        A.     No, it won't.  You'll get an error.

9        Q.     Okay.  So if a comma is put into a demand

10  amount, then an error will arise, correct?

11       A.     Correct.

12       Q.     And what if a period is put into the

13  demand window; is the same true?

14       A.     I believe so.

15       Q.     Okay.  So would it be your testimony that

16  the only way that a demand amount could be placed

17  into that box without -- without receiving an error

18  would be to put in a number without a dollar sign,

19  without a comma and without a period?

20       A.     Correct.

21       Q.     And if -- if a number is placed into that

22  demand and if it doesn't move forward to the next

23  screen because, let's say, there's a dollar sign on

24  the demand, is there not a Back button that a person

25  can push to back up to the prior screen?



1     A.     Well, I think if you get the error, it

2   allows you to correct that.

3     Q.     Okay.  So if it --

4     A.     But you could hit the Back button and...

5     Q.     Okay.  And clear the number?

6     A.     Yeah.

7     Q.     Okay.  Do you know if the -- when the

8   error arises if it clears the screen or does the user

9   have to clear the screen?  When I say "clear the

10  screen," clear the demand.

11    A.     I believe the user has to clear the demand

12  and put in the...

13    Q.     So a user having a number in there that

14  receives an error -- let's say that the number -- a

15  dollar sign with the number 156 -- or 168 is put

16  into there --

17    A.     Uh-huh.

18    Q.     -- your testimony is it would never

19  advance to the next screen because there's a dollar

20  sign, correct?

21    A.     Correct.

22    Q.     And so at that time the user would either

23  have to go in and delete the numbers in that box or

24  else back up to an earlier screen and -- and move

25  back, correct?



1        A.     Right.

2        Q.     Are you familiar with the term "cache"?

3        A.     Yes.

4        Q.     And what does that mean to you?

5        A.     The information, I guess, that's saved in

6   the browser.  Especially if attorneys are having

7   issues, if -- I'll get calls and they can't move

8   forward or there's an error that just keeps repeating

9   themselves, we tell them to clear their browsing

10  history, which is their cache, and get rid of all the

11  information that might be behind the scenes causing

12  the issue -- the problem.  And usually once they do

13  that, then they can move forward and complete their

14  docket that they are doing.

15       Q.     Okay.  Thank you for that explanation.

16              How -- so you're saying that the user

17  wouldn't see the information or data in the cache; is

18  that correct?

19       A.     That's correct.

20       Q.     And that you would instruct them that in

21  order to clear the cache that they should go back --

22       A.     Well, not --

23       Q.     -- or clear the cache or -- how do they

24  clear the cache?

25       A.     Yeah, clear the cache.



1          Well, every browser is different and -- so

2    they would have to know how to do it.  Either -- at

3    the top of the browser there's a place where they

4    can -- it has where you click on in -- at the top of

5    the browser, wherever, there's an option to clear

6    their history, and they could do it for an hour, they

7    could it for all day, but...

8          Q.    So if a user put in a dollar number -- a

9    dollar sign with a number of 168 and received an

10   error, and then the box was clear, the user wouldn't

11   necessarily know whether the cache is cleared or not;

12   is that correct?

13         A.    No.

14         Q.    So there could actually be hidden numbers

15   in the box that the user can't find?

16         A.    Well --

17         Q.    Or doesn't see?

18         A.    I don't know about hidden numbers,

19   especially in that demand amount.  You're -- you say

20   you got -- I mean, the error is going to pop up.

21   Usually when attorneys have an error, they can't move

22   forward at all, and so they have to clear out their

23   browsing history.  But we, you know, discussed before

24   that the dollar sign -- that error came up, but

25   something needed to be changed.



1    Q.    Right.  So at the top it has a button that

2  says History, and you're saying that when people call

3  in you can explain to them that they can clear their

4  history?

5    A.    Yeah.  I guess if you look -- because

6  you've got the screenshot there of Google.  There is

7  the three dots at the top -- top right-hand...

8    Q.    Uh-huh.

9    A.    And usually that's -- when you click on

10  those three buttons there's the option that comes up

11  for history as one of them.  So they could go through

12  the steps to clear out the history.

13    Q.    But there's nothing on the screen, is

14  there --

15    A.    No.

16    Q.    -- that says that if you have a problem,

17  this is how you -- you would clear the cache,

18  correct?

19    A.    No.

20    Q.    But -- and you -- you've affirmatively

21  agreed that it -- you cannot move to the other

22  screens and complete a filing if you cannot get past

23  the demand screen?

24    A.    It's been my experience and -- that you

25  could leave that demand amount blank and it will let



1   you go through to the next screen.

2        Q.    You --

3        A.    You don't have to put a number in there.

4        Q.    That's been your experience?

5        A.    Yes.

6        Q.    So do you know, under the system, does

7   filing of the Complaint occur before the adversary

8   proceeding is opened, or is the adversary proceeding

9   opened before the Complaint is filed?

10       A.    Well, there's --

11       Q.    Is it simultaneous?

12       A.    It's simultaneous.  I mean, that's...

13       Q.    So if -- if a document says that the

14   adversary proceeding opens, then that would -- that

15   would mean that there was a complaint filed

16   simultaneously with that entry?

17       A.    Because your -- your complaint is the

18   document that's getting uploaded into the system,

19   which is, you know, the adversary proceeding.  So

20   once it is simultaneous, your complaint is what

21   you're using to open up the adversary, because that

22   has all the information that you're putting into the

23   system.  But then once that's all completed and you

24   go through the steps, then your adversary is open.

25       Q.    Okay.  So the -- you wouldn't have to open



1    an adversary proceeding, pay the fee and then file

2    the complaint?

3         A.    No, it doesn't work that way.

4         Q.    Instead, the complaint -- the complaint

5    and the adversary open simultaneously?

6         A.    Yeah.

7         Q.    Okay.  Let me show you -- okay.  Okay.

8    Are you familiar with what a transaction log is?

9         A.    Yes.  Uh-huh.

10        Q.    Okay.  Could you explain to the Court what

11   that is?

12        A.    It identifies the steps or behind the

13   scenes of what happened when the case is opened or a

14   docket entry is put on the docket.  It gives you an

15   ID number and the event that was used to -- to be put

16   onto the docket.

17        Q.    Okay.  And so looking at Exhibit 14, could

18   you identify that for us, starting on the left-hand

19   side, to the yellow?  Do you see where it has the

20   number?

21        A.    Yeah, it has the date.

22        Q.    Well, before the date it has the number.

23   Is that the adversary -- what number is that?

24        A.    On the yellow, that's the transaction ID.

25        Q.    Okay.



1    A.    That's not the adversary number at all.

2  That's the transaction ID.  Every entry that's put on

3  the -- in the system has a transaction ID.

4    Q.    Okay.  That identifies that particular --

5    A.    Yes.

6    Q.    -- transaction entry?

7    A.    Yes.

8    Q.    And then the date.  What does that

9  reflect, the time that that transaction number is

10  recorded?

11    A.    Yes.  Uh-huh.

12    Q.    Okay.  And you call -- that's called a

13  log; is that right?

14    A.    Yeah.  Your transaction log, yes.

15    Q.    Okay.  And then next to that there's

16  nothing in the case number there, but then go to the

17  right.  Could you read that for me?

18    A.    This is a temporary log entry to handle

19  timing issues with docketing the same event many

20  times.

21    Q.    Have you seen that entry before?

22    A.    Not recently.

23    Q.    Do you have a memory of ever seeing that

24  entry?

25    A.    Not really, no.



1      Q.     And when that entry -- the information --

2   can you tell me what your understanding would be as

3   to that language?

4      A.     Well, it's timing issues with docketing

5   the same event many times.  So -- I mean, the entry

6   -- two entries above that the -- it looks like the

7   adversary proceeding was open and the summons was

8   issued.  And so just by that, by maybe clicking the

9   Back button, it's recording that the event that's

10  been entered has already been entered before 'cause

11  it's --

12     Q.     So it wouldn't happen in a normal filing,

13  right, because it --

14     A.     No, not in the normal finding.

15     Q.     Had there not been repeated attempts --

16     A.     Right.

17     Q.     -- then that entry -- that sort of log

18  would not have occurred, correct?

19     A.     Right.  Right.

20     Q.     So doesn't that occur to you that that log

21  entry is to document that there were (counsel stepped

22  away from mic) timing issues with docketing the same

23  event many times?

24     A.     But -- yes, but if you look at your other

25  transaction IDs that happened before that, the



1   Adversary Complaint was opened and then the summons

2   issued.  So the adversary was filed.  And so the

3   timing issues of going back, it was not going to

4   reopen an adversary -- that's not going to file

5   another adversary proceeding because it's already

6   been there on the docket.

7       Q.    Right.  But at the time this was entered,

8   the multiple docketing entries would have occurred,

9   right?  They wouldn't have occurred after that

10  because this -- this was entered at this period of

11  time right here, correct?

12      A.    Right.

13      Q.    Okay.  So if there were multiple events,

14  they had to have occurred prior to that time; would

15  you not agree?  It's not picking up stuff that

16  occurred 30 days -- 30 minutes, 40 minutes later,

17  correct?

18      A.    Oh, no.  No.

19      Q.    Okay.  Now let me ask you to look at

20  what's been marked as Exhibit 11.

21      A.    Okay.

22      Q.    Do you know what a case report is?

23      A.    Yes.  Uh-huh.

24      Q.    Can you explain to the Court and me what

25  that report is?



1      A.    There's a cases report option under CM/ECF

2    under reports and you can put a date range in there

3    for cases that were filed on a given day.

4      Q.    Okay.  Would you turn to Exhibit 11 in the

5    Bank's exhibit book there in front of you?

6      A.    Okay.

7      Q.    So can you identify what that document is?

8    There's an excerpt of it here on the board, but the

9    Exhibit 14 is a little bit more -- or Exhibit 11 has

10   a little more detail.  Can you tell us what that is?

11     A.    It's off of the cases report that gives

12   you the -- well, these are the adversary case numbers

13   that were filed and who the party info is and the

14   attorney information.

15     Q.    And is this a report that's generated from

16   the -- the court's database?

17     A.    Yeah.  Of what's been filed, yes.

18     Q.    So the attorneys don't have the ability to

19   go in and manipulate this document, do they?

20     A.    No.  Huh-uh.

21     Q.    It would be only generated by the court,

22   correct?

23     A.    Correct.

24     Q.    And you've seen this -- these kind of

25   reports -- you've actually used this report -- case



1    report identification yourself on occasion?

2         A.    Correct.

3         Q.    So would you look here at an excerpt of

4    this report here and just identify -- we can go

5    across this row.  You see there in the -- the center

6    column -- again of Exhibit 11 -- is it first showing

7    there the -- what is that, the lead -- the first

8    number here, is this the adversary?

9         A.    That's the adversary case number.  And

10   then it shows the lead bankruptcy case number --

11        Q.    Okay.

12        A.    -- which is...

13        Q.    Allen Beal, Chapter 7?

14        A.    Right.

15        Q.    And then going to the next column there,

16   the TP?

17        A.    It shows -- first it shows the plaintiff

18   information, which is the State Bank of Southern Utah

19   versus Beal.  And then they have the attorney that's

20   representing the plaintiff, Steven W. Call.  Then the

21   attorney for -- well, another attorney for the

22   plaintiff, Justin Michael Kuettel.  And attorney for

23   the defendant, William B. Morrison.

24        Q.    Right.  And then next is --

25        A.    It's the judge who is involved.



1      Q.    Right.  And then explain for us, if you

2    will, what the next box -- what the next boxes

3    represent.

4      A.    There's a file date of 4-23 and an enter

5    date of 4-22.

6      Q.    Okay.

7      A.    And --

8      Q.    And then what are the -- okay.  Let me ask

9    you, have you ever seen an occasion where those two

10   dates are different?

11     A.    I haven't.

12     Q.    Okay.  And just the final part of that row

13   is other information that just reflects this is the

14   Salt Lake office, right?

15     A.    That is correct.  Uh-huh.

16     Q.    Now, it -- it's my understanding that --

17   that the ECF manual for the district court is revised

18   and updated quite regularly, but that there hasn't

19   been a revision made to the ECF manual with the

20   bankruptcy court for more than a decade.  Is that

21   correct?

22     A.    That's true.

23     Q.    And is it also accurate that at one time

24   Kyle Quail, you and Carol began a process a few years

25   ago to update the manual but that that was abandoned?



1      A.    Well, I think you have your parties wrong

2  there, but...

3      Q.    Well, I thought these were the names you

4  gave me when we visited.  Who is Kyle Quail?

5      A.    It's Kyle Crockett.

6      Q.    Oh, Crockett.  I'm sorry.

7      A.    Yeah.

8      Q.    Kyle Crockett and Carol --

9      A.    Jared Johnson and John Willardson.  The

10  four of us worked on...

11      Q.    Gerald Johnson?

12      A.    Jared.

13      Q.    Jared.

14         And who was the other person?

15      A.    John Willardson.

16      Q.    John Willardson.

17         And you worked on some re -- possible

18  revisions to the manual -- this was in 2014?

19      A.    Yeah, something.  Around there, yes.

20      Q.    But my understanding was that those

21  efforts were never completed.  Is that a better

22  statement?

23      A.    The assignments and duties changed of

24  individuals so we never did complete it.  But CM/ECF,

25  at least with the bankruptcy court, the procedures



1    never -- and the steps never really changed that

2    much.  So we didn't really find it of benefit to keep

3    it updated.

4          Q.    Do you have copies of the revisions that

5    you all started on, to the manual?

6          A.    I probably could find them, but I don't --

7    we didn't get really that far into it.

8          Q.    Do you ever coordinate with the district

9    court regarding its revisions and updating to its

10   manual?

11         A.    No, we don't because -- yeah, their filing

12   systems are CM/ECF, but the way they file documents

13   and their type of pleadings, they are totally

14   different from the bankruptcy court.

15               MR. CALL:  Okay.  Okay.  Thank you.

16                    CROSS-EXAMINATION

17   BY MR. MORRISON:

18         Q.    Okay.  Let's see.  So this document here,

19   Exhibit 11 that we have blown up here, I just wanted

20   to ask you a quick question about the file date.

21   (Counsel stepped away from mic).

22               THE CLERK:  Mr. Morrison, you'll need to

23   speak into a microphone.

24               MR. MORRISON:  Okay.  Sorry.

25         Q.    So you -- you saw where I was pointing on



1   that exhibit?

2       A.    Yes.

3       Q.    Thank you.

4             Do you see the filing date was April 23rd,

5   and then there's a different enter date of 4-22-19?

6   Do you have an understanding of why those dates might

7   be different in this particular case?

8       A.    The report we -- the report is really -- I

9   mean, it's just a report.  What we real -- go by

10  and -- 'cause not all the reports, you know, are --

11  are perfect.  And there has been other issues with,

12  you know, different reports -- not necessarily this

13  one but with other reports that you run.

14            What's -- we go by and what I tell the

15  attorneys when I'm training them is, You need to

16  look -- and we discussed this yesterday -- the notice

17  of electronic filing.  And I believe Gloria gave you,

18  you know, an example of that.  And that gives the

19  attorneys the date and the time of when their

20  document was filed with the court.

21            And I stress in the trainings that we have

22  them -- especially if they are new on filing with the

23  court -- that they need to make sure that they get

24  that notice of electronic filing to, you know,

25  indicate to them and to the court that their document

CITICOURT
THE REPORTING GROUP

1   or pleading entry got put on the court's docket.

2        Q.    Okay.  Very good.  And the term there

3   that's used as filed, is that referring to the filing

4   of the Adversary Complaint?

5        A.    Yeah, that's what you would take from

6   that.

7        Q.    Okay.  And then what does the term

8   "entered" refer to, if you know?

9        A.    I would -- like I say, the reports --

10             THE COURT:  So he said if you know,

11   Ms. Tanner.

12             MR. MORRISON:  Yeah.

13             MR. CALL:  I'm going to object for lack of

14   foundation.

15             THE WITNESS:  I don't know.

16             MR. MORRISON:  That's why I was asking if

17   she knew.

18             THE WITNESS:  No.

19             THE COURT:  And she was trying to answer

20   and I was just making sure she understood --

21             MR. MORRISON:  Yes.

22             THE COURT:  -- "if you know."

23             MR. MORRISON:  Yes.

24        Q.    And your response, just so we have a

25   record of that, was you don't know?



1     A.    I don't.

2     Q.    Okay.  Thank you.

3           All right.  I believe that you testified

4   that you help -- you're one of the individuals that

5   helps man the help desk at the court.  Is that right?

6     A.    Yes.

7     Q.    And what are the hours of operation for

8   the help desk, typically?

9     A.    Typically 8:00 to 4:30, but usually I'm

10  here later.  So it could be after 5:00.

11    Q.    Okay.  And is the help desk 24/7 hours of

12  operation or does it end when you go home?

13    A.    It ends when I go home, yes.

14    Q.    Okay.  It's not going to be open at

15  11:50 p.m.?

16    A.    No.  I kind of would like a life after I

17  leave the court.

18    Q.    Okay.  Thank you.

19          And you're involved in the -- in the

20  training for users that use the CM/ECF system --

21  filing system?

22    A.    Correct.

23    Q.    Is that one of your main responsibilities?

24    A.    I wouldn't say "main," but it's one of my

25  duties.



1          Q.     Okay.  Very good.

2                 How often do you perform training

3     services?

4          A.     Once a month.

5          Q.     Do you know or can -- do you recall if you

6     might have trained Mr. Call in -- in using that --

7     that service?

8          A.     No, I wasn't training at that time.  We

9     had other trainers involved.

10         Q.     Very good.

11                THE COURT:  What time?

12                MR. MORRISON:  At the time that he would

13    have done the training.

14                THE COURT:  Do you have any idea when that

15    was?

16                MR. MORRISON:  Well, he testified it was

17    several years ago.  That's all that he testified to.

18         Q.     So I was just asking if you were involved

19    in -- in doing any training for Mr. Call.

20         A.     No.

21                THE COURT:  Thank you.

22         Q.     (BY MR. MORRISON)  I think you testified

23    that the manual for CM/ECF users has not been updated

24    for approximately ten years or longer.

25         A.     Correct.



1    Q.   And the reason for that is the steps -- I

2    think you testified the steps don't change much so

3    there's not really a benefit to completing the

4    revisions?

5    A.   Correct.

6    Q.   Are you familiar with the old manual going

7    back approximately ten years or so?

8    A.   It's been a while since I've looked at it,

9    but...

10    Q.   You've reviewed it -- or you had reviewed

11    it at some point?

12    A.   Yes.

13    Q.   Okay.  I guess I just wanted to ask if you

14    were familiar with what the manual might say as far

15    as it being appropriate for the data entry field,

16    when you're entering a demand when you're filing an

17    adversary complaint.

18    A.   I do have -- of course I didn't make

19    copies for everyone.  Sometimes -- maybe the

20    attorneys can't attend our training, and so we'll --

21    we have a practical exercise.  And depending on who

22    the attorneys represent, if they are representing a

23    debtor or a creditor, then we'll give them an

24    exercise on what to do.  And one of them, for a

25    creditor, is to open an adversary proceeding.  And it



1    goes through the steps and what they need to do and

2    the information they need to put in to -- when they

3    open an adversary case.

4         Q.    Okay.  Fair enough.  Okay.  Turned around

5    the Exhibit 3 -- the blowup of Exhibit 3 -- and I

6    just wanted to get some clarification on your

7    interpretation of the Demand field.  How do you

8    interpret what's in parentheses?  Is that the

9    information that's already entered into the field?

10        A.    It is.  I mean, base -- because I know how

11   the system works, it -- I know that adding the

12   zeros -- I mean, those zeros there are automatically

13   going to be added after you put in that number of

14   what you're demanding.

15        Q.    And the dollar sign, likewise, is already

16   going to be added?

17        A.    Yes.

18        Q.    Okay.  How long have you done training for

19   CM/ECF users for the court?

20        A.    Going on three years.

21        Q.    Has there ever been any point in time

22   during the course of your training that you would

23   train users to put in a dollar sign in that field?

24        A.    No, I wouldn't.

25        Q.    Okay.  If a dollar sign had been entered,



1    would that not constitute user error?

2          A.    Well, it could give you an error.

3          Q.    What would be the error message?

4          A.    I'm not for sure what it would be.

5          Q.    Okay.  But you'd seen an error message

6    from that?

7          A.    Yes, you would.

8          Q.    So if you entered a dollar sign, you're

9    going to get an error message, which tells you that

10   you are not entering in the correct information?

11         A.    Correct.

12         Q.    And you would also get an error message if

13   you entered a comma in that field, correct?

14         A.    Correct.

15         Q.    Which, once again, tells you that you are

16   not entering the correct information?

17         A.    Correct.

18         Q.    And if you enter a decimal point in that

19   field, once again, that would prompt an error

20   message?

21         A.    Correct.

22         Q.    Because you're not entering the correct

23   information?

24         A.    Right.

25         Q.    And the error message is intended to help



1    you so that you enter the correct information?

2        A.    Correct.

3        Q.    And so you can move forward to the next

4    screen?

5        A.    Exactly.

6        Q.    In the course of your training for CM/ECF

7    users, have you ever trained filers to enter a

8    decimal point when they are entering a number in that

9    field?

10       A.    No.

11       Q.    Have you ever trained users to enter a

12   comma in that field?

13       A.    No.

14       Q.    Were you here in court yesterday when

15   Mr. Call testified?

16       A.    Yes.

17       Q.    And did you hear his testimony as far as

18   the experience that he had in attempting to file the

19   Adversary Complaint in this case?

20       A.    Yes.

21       Q.    Okay.  And did you hear his testimony that

22   referred to the multiple times that he hit the Back

23   button?

24       A.    Yes, I did.

25       Q.    Okay.  Do you train users to hit the Back



1   button when they experience an error in the course of

2   filing a document?

3        A.    It would depend on the error, because in

4   this instance, with the demand amount, because you're

5   getting an error window that comes up, I would --

6   don't see the need that you would need to hit the

7   Back button to fix that error.

8        Q.    Okay.  Very good.

9              So do you have the State -- State Bank's

10  exhibit binder in front of you?

11       A.    Yes.

12       Q.    And could you open that to Exhibit 3,

13  page -- page 13?  And I think it would be the second

14  doc -- the second page --

15       A.    Log-in page?  Is that --

16       Q.    Yes.  Does it have a little 13 at the

17  bottom right corner?

18       A.    Yes.

19       Q.    Okay.  Thank you.

20             At the very bottom of that document it

21  says, "CM/ECF has been tested using Firefox and

22  Internet Explorer," correct?

23       A.    Correct.

24       Q.    It doesn't say anything about being tested

25  for Google Chrome?



1    A.    No, it doesn't.

2    Q.    Okay.  I'm just directing your attention

3  to April 23rd, the day after the bar date in this

4  particular case for filing an objection to discharge.

5  Do you recall having any conversations by phone or

6  otherwise with Mr. Call that day?

7    A.    I did with Carrie Hurst in the morning

8  regarding the payment.

9    Q.    But what about Mr. Call?

10    A.    I don't remember.  I did speak with

11  Mr. Call, but I don't remember if it was that day or

12  maybe the following day.

13    Q.    Okay.  I guess the question I had was

14  whether Mr. Call had reported that -- or, rather,

15  that you told Mr. Call that the problems and error

16  messages that he had received reflect that the

17  software was not operating correctly.  Is that

18  something you told Mr. Call?

19    A.    No, I didn't.

20          MR. MORRISON:  Thank you.

21          Nothing further, your Honor.

22          MR. CALL:  Just one question, I think.

23              REDIRECT EXAMINATION

24  BY MR. CALL:

25    Q.    The debtor has presented as an exhibit in



1   this case, one of his few exhibits, the district

2   court manual for electronic filing.  It doesn't have

3   any relevancy whatever to filings made in the

4   bankruptcy court, does it?

5         A.    No.  Huh-uh.

6         Q.    In fact, it doesn't address --

7               MR. MORRISON:  Your honor -- sorry.  I

8   object.  That's beyond the scope of my examination,

9   but I have not presented that as an exhibit in this

10  case.  It's not part of our evidentiary exhibits.

11  I'm not trying to --

12              THE COURT:  I was trying to -- I was lost,

13  Mr. Call, because, first of all, your reference to it

14  being one of the debtor's exhibits -- it hasn't been

15  discussed before and it's not in the exhibit binder.

16  It was filed -- I believe filed -- provided for

17  with -- it was provided to us as one of your

18  exhibits.  And my understanding, you filed it with

19  the court.

20              UNIDENTIFIED SPEAKER:  Back in July when

21  we were asked to file exhibits -- it would have been

22  filed back then.

23              UNIDENTIFIED SPEAKER:  Well, we were given

24  an exhibit -- just to complete it; that manual has no

25  relevance.



1            UNIDENTIFIED SPEAKER:  Just don't see how

2    this is relevant.

3            THE COURT:  Well, both of you agree.

4            UNIDENTIFIED SPEAKER:  We agree, yes.

5            THE COURT:  And you agree too, right, no

6    relevance?

7            THE WITNESS:  No relevance.

8            THE COURT:  All right.  Any other

9    questions?

10            MR. CALL:  No, your Honor.  Thank you.

11            THE COURT:  You may step down.

12            Does she need to be here?  Can she go back

13    to work if she wants?

14            MR. CALL:  She -- we can excuse --

15            THE COURT:  We can excuse her?

16            MR. MORRISON:  We'll excuse her.

17            MR. CALL:  I will excuse her.

18            THE COURT:  I will take a quick recess.

19            THE CLERK:  All arise.

20            (Recess taken.)

21            THE CLERK:  Court resumes in session.

22    Please be seated.

23            THE COURT:  All right.  Mr. Call, do you

24    have another witness?

25            MR. CALL:  Yes.  We would like to call --



1    or I would like to call Russell Jones.

2              THE COURT:  Mr. Jones, if you would come

3    forward and be sworn.

4              THE CLERK:  Raise your right hand.

5              (Witness sworn.)

6              THE CLERK:  Have a seat on the witness

7    stand.  State and spell your name for the record,

8    please.

9              THE WITNESS:  Russell Jones.

10   R-u-s-s-e-l-l, J-o-n-e-s.

11                    RUSSELL JONES,

12        called as a witness, being first sworn,

13          was examined and testified as follows:

14                 DIRECT EXAMINATION

15   BY MR. CALL:

16        Q.    Thank you.

17              Russell, what is your position with the

18   court?

19        A.    Unit system administrator.

20        Q.    And how long have you been in that

21   position?

22        A.    Twenty years.

23        Q.    And what are your duties?

24        A.    Maintaining the system, like checking the

25   file space and putting on updates.



1      Q.     And when you say "updates," updates to

2   what?

3      A.     To the database and CM/ECF program.

4      Q.     So you are able to -- are these updates

5   that you program or someone else programs?

6      A.     The AO sends those to us.

7      Q.     Okay.  So you -- when those updates come,

8   you integrate those into the software?

9      A.     Yes.

10          THE COURT:  Just so the record is clear, I

11   think Ms. Tanner may have used the acronym AO.

12   Mr. Jones just used the acronym AO.  Someone reading

13   the record may not know what AO is.

14          THE WITNESS:  Administrative Office of the

15   U.S. Courts.  They create the programs and send them

16   to us.

17          THE COURT:  Okay.

18      Q.     (BY MR. CALL)  And so they send them to

19   you via e-mail or in a flash drive?

20      A.     They send us an e-mail -- or notice saying

21   they're available and we can download them from their

22   site.

23      Q.     Okay.  I see.  So that's one of the -- the

24   duties you perform?

25      A.     Uh-huh.



1      Q.     Have you spoken with anyone about your

2   testimony today?

3      A.     No.

4      Q.     Have you reviewed any documents in

5   preparing for your testimony today?

6      A.     No.

7      Q.     And were you present -- you've been

8   present in the courtroom today and yesterday when the

9   testimonies were given?

10      A.     Yes.

11      Q.     Okay.  So you consider yourself to be

12   quite familiar with the ECF software?

13      A.     No.

14      Q.     You're not?

15      A.     I don't run these screens.

16             THE COURT:  Just so the record's clear,

17   he's gesturing towards the demonstrative exhibits --

18             THE WITNESS:  The CM/ECF --

19             THE COURT:  -- posters.

20             THE WITNESS:  -- program.

21             THE COURT:  Okay.

22             THE WITNESS:  People like Janene take care

23   of that.

24      Q.     (BY MR. CALL)  But you have some

25   familiarity with these screens, do you not?



1          A.     Yeah.  I've seen them, but I've never been

2    trained on their use.

3          Q.     You have not?  Do you address problems

4    that Janene may confront in connection with her

5    helping users?

6          A.     That would be the flow.  If users reported

7    a problem to her, then she would report it to me, but

8    I can't think of that happening.

9          Q.     You don't have a recollection of that ever

10   happening?

11         A.     No.  I'm sure it did in the early days,

12   but I can't think of any incidents within the past

13   several years.

14         Q.     Okay.  So if I -- in looking at what's

15   been marked here as Exhibit 3, you understand that

16   that's one of the screens in the ECM --

17         A.     ECF.

18         Q.     Or ECF filing system?

19         A.     Yeah.

20         Q.     And are you familiar with the -- how a

21   user progresses through the system?

22         A.     Roughly.  I know that they would -- on

23   this one, Exhibit 3, they would put in the proper

24   values and select them and then click Next.

25         Q.     Okay.  And have you -- have you dealt with



1   issues where metadata may -- metadata is stored in a

2   cache of the user?

3        A.    I'm familiar with it.

4        Q.    And can you explain that, what -- what

5   that is?

6        A.    Well, it -- there are different Internet

7   browsers -- or web browsers, they are called, and

8   they have different ways of caching data.

9        Q.    Okay.

10       A.    And so we know that when people have a

11  problem, if we tell them to clear their cache and

12  start over, that usually takes care of it.

13       Q.    Okay.  So do you happen to know, looking

14  over at Exhibit 3, which is the board on the right,

15  Bates number 20 -- are you familiar with that screen?

16       A.    No.

17       Q.    No?

18             Do you know what screen follows that

19  screen?

20       A.    No.

21       Q.    Okay.  Coming back to Exhibit 3, over on

22  this left side, do you know whether or not a user can

23  progress or advance to the next screen if a demand

24  amount is not inserted into the demand window?

25       A.    No, I'm not familiar with that.



1        Q.    Okay.  Are you familiar with problems --

2   or are you familiar with the issue about if a number

3   is not entered in a certain manner that the window

4   will not progress or advance?

5        A.    No, I'm not familiar with that, but it

6   seems like that would happen.  If it was required, it

7   would tell you -- it would prompt you.

8        Q.    With an error message?

9        A.    Perhaps.

10        Q.    What other prompt would there be besides

11   an error message?

12        A.    For example, when -- I've done some

13   testing that -- there's a box where you can upload a

14   document.  And then if you go next, it says you need

15   to -- you can enter a document or upload a document.

16   It looks like a -- an error or a problem, but

17   actually you can just say that's okay, that was my

18   intention not to do it.

19        Q.    Okay.  Okay.  Let me show you here what's

20   been marked as Exhibit 11 and Exhibit 14 of the

21   Bank's exhibits.  Are you familiar with what a case

22   report is?

23        A.    Yes.

24        Q.    Okay.  Can you describe what your

25   understanding of that report is?



1        A.      You can put in a date range and the --

2    like the type of case or the chapter, and it will

3    show you the ones that were entered or filed --

4        Q.      Okay.

5        A.      -- during that time period.

6        Q.      Okay.  And you said -- you used the term

7    "entered or filed"; is that right?

8        A.      Yeah.  I believe you can select those

9    different -- entered or filed dates.

10       Q.      Oh, I see.  Okay.

11               And on this particular Exhibit 11, do you

12   see in the center column there that it is referring

13   to this -- the case at issue here before the Court?

14       A.      Okay.

15       Q.      The State Bank?

16       A.      Yeah.  I was never told the case numbers,

17   but okay.

18       Q.      Okay.  Do you see the -- in the columns

19   there -- in the first column it identifies the

20   adversary proceeding, the bankruptcy case number?

21       A.      Yes.

22       Q.      Okay.  So if you go over to the fourth

23   column -- let's see, one -- you see the second column

24   says AP?

25       A.      Yeah.



1      Q.     Do you know what that stands for?

2      A.     I think it means adversary proceeding, the

3  type of case.

4      Q.     And then you see the party information in

5  the next column?

6      A.     Yes.

7      Q.     And then the -- the judge has signed the

8  adversary proceeding?

9      A.     Yeah.

10      Q.     Okay.  And then in the next column there

11  it has the dates, correct?

12      A.     Correct.

13      Q.     And what are those dates?  What's your

14  understanding as to what those dates are?

15      A.     The "entered" is when it was physically

16  entered onto the system, and "filed" is, like, when

17  it was filed with the court.

18      Q.     Okay.

19      A.     So, for example, if someone comes in very

20  late in the day and they submit something over the

21  counter, they won't have -- the case managers will

22  wait until the next day or the next workday to enter

23  it.  So they would put the filing date as the day

24  they received it, but the entered date would be the

25  date when the case manager put it on the system.



1      Q.    Okay.  So in this case if it says

2  something was entered on the 22nd, is that --

3  would -- am I understanding that that would have been

4  a date that it would have been entered?

5      A.    Well, it's my understanding that for

6  outside users, like attorneys and trustees, that the

7  filed and entered dates will always be the same.

8      Q.    They will always be the same?  So in this

9  particular case they are not the same, are they?

10      A.    No.

11      Q.    Okay.  And would you -- do you -- do you

12  have any reason -- well, strike that.

13            Will you look over at Exhibit 14?

14      A.    Okay.

15      Q.    Do you know what a transaction log is?

16      A.    Yes.

17      Q.    And what is it?

18      A.    A log of the actions that take place on

19  the system.

20      Q.    So you're familiar with that -- that

21  report?

22      A.    Yes, somewhat.

23      Q.    Okay.  And do you see there on the third

24  row that's highlighted in yellow the -- a log entry

25  that was made?



1        A.    Yes.

2        Q.    Okay.  And do you see on the left-hand

3   side it has the ID number?  And I believe you heard

4   Janene testify that that's a specific ID number for

5   that particular entry?

6        A.    Yeah.

7        Q.    And then next to it has a date -- a date

8   of that particular entry.  Do you see that?

9        A.    Yes.

10       Q.    Now, isn't it accurate that that would

11  have been the date that that particular item was

12  logged into the system on the database?

13       A.    Yes.

14       Q.    Okay.  And then if I go over there to the

15  far right column, could you read that language?

16       A.    "This is a temporary log entry" -- that --

17  "to handle timing issues."

18       Q.    Yeah, would you read that whole --

19       A.    Okay.  This is a --

20       Q.    Can I just have you speak into the

21  microphone?

22       A.    Okay.  "This is a temporary log entry to

23  handle timing issues with docketing the same event

24  many times.  22196349."

25       Q.    Have you ever seen that log-in entry



1  before?

2       A.    Once in a while.

3       Q.    Okay.  Now, what -- what is it referring

4  to, do you know?  Do you have -- do you have an

5  understanding of it?  I'm not asking you to

6  speculate.  If you know, then I'd like you to tell

7  us.

8       A.    Well -- no, I don't know exactly when.

9       Q.    Do you have an understanding?

10      A.    I have a -- well, it could possibly occur

11  for different things, but my understanding is, is

12  when someone uses the back arrow and forward arrow

13  and the Next, they try to resubmit something they

14  have already re -- they have already submitted.  So

15  it's basically saying you already submitted this, so

16  I'm not going to do it again.

17      Q.    Okay.  And is that what it's referring to

18  where it says "docketing the same event many times"?

19      A.    I presume.

20      Q.    Is that -- I think that -- isn't that what

21  you just testified to?

22      A.    Well --

23            THE COURT:  I heard what he said,

24  Mr. Call.

25            MR. CALL:  Okay.



1           THE COURT:  He said he didn't know.  He

2    said he has an understanding and he's not -- and he

3    presumes that it might be something.

4           THE WITNESS:  I'm not an expert on all of

5    these.

6           THE COURT:  Okay.

7      Q.    (BY MR. CALL)  You -- you weren't involved

8    with any sort of recommendations regarding the

9    updating of the manual, were you?

10     A.    No.

11     Q.    Okay.  Now, do you recall a telephone call

12   that you and I had on April 23rd?

13     A.    Yes.

14     Q.    Okay.  And did I not report to you that I

15   had encountered problems in attempting to make a

16   filing?

17     A.    Yes, you did.

18     Q.    And did we -- did I not report to you

19   certain error messages that I received during the

20   filing process?

21     A.    Yeah, I think I remember about the

22   non-integer or missing value or something.

23     Q.    Okay.  And we had a discussion about that

24   problem, correct?

25     A.    Yes.



1      Q.    And did you not give me an explanation

2   about problems that occur when the backup button is

3   used?

4      A.    Well, I'm aware that they can happen, so

5   I -- that's what -- that would be usually what my

6   standard recommendation to an end user would be, is

7   to clear their cache or start over.

8      Q.    Okay.  And did you not indicate that --

9   that in those events that sometimes backing up to a

10  single screen just simply doesn't solve the problem

11  and that you told me that you need to go back to the

12  blue screen or log out and re-log in?

13     A.    Yeah, I -- I think I said that.

14           MR. CALL:  Thank you.

15                CROSS-EXAMINATION

16  BY MR. MORRISON:

17     Q.    Hello, Mr. Jones.  I don't have a lot of

18  questions for you.  Just a couple questions,

19  actually.

20           Let's start with this conversation that

21  you had with Mr. Call on April 23rd.

22           Did you ever tell Mr. Call that the

23  problems that he was reporting were due to ECF

24  software malfunctioning or not working properly?

25     A.    No.



1    Q.    Okay.  Looking at this blowup of

2  Exhibit 11, do you know -- do you know why the filed

3  and entered date, which are highlighted in yellow

4  there, are different in this particular case?

5            THE COURT:  Well, it's been asked and

6  answered, but go ahead.  I'll allow the question.

7    Q.    (BY MR. MORRISON)  Do you know why those

8  dates are different?

9    A.    The only reason I know is because we had a

10 prior meeting, and Mr. Gfeller found the reason.

11 It's just a quirk of that report.

12   Q.    Okay.  And he would be a better person to

13 testify to that, then?

14   A.    Yes.

15   Q.    Okay.  Thank you.

16           Are you familiar with the error message

17 case opening failed, writing answer record?  Are you

18 familiar with that?

19   A.    No.

20           MR. MORRISON:  Okay.  Thank you.

21           Nothing further, your Honor.

22           THE COURT:  All right.  Any other

23 questions, Mr. Call?

24              *

25              *



                        REDIRECT EXAMINATION
1
2    BY MR. CALL:
3         Q.    Are you able to tell us -- or give us a
4    list of the different error messages that come up
5    under the E -- under the ECF system?
6         A.    Huh-uh.  I could research that.
7         Q.    Okay.  But you don't know those today, do
8    you?
9         A.    No.
10        Q.    But aren't there several?
11        A.    Yeah.
12             MR. CALL:  Okay.  Thank you.
13             THE COURT:  All right.  You may step down,
14   Mr. Jones.
15             And he may be excused as well?
16             MR. CALL:  Yes.
17             MR. MORRISON:  Yes.
18             THE COURT:  All right.  Do you have
19   another witness, Mr. Call?
20             MR. CALL:  Well, I -- I guess we would
21   call Gary Gfeller.
22             THE COURT:  All right, Mr. Gfeller, if you
23   would come forward, please.
24             (Witness sworn.)
25             THE CLERK:  Be seated at the witness



1    stand.  State and spell your name for the record,

2    please.

3                   MR. GFELLER:  Gary Gfeller.  G-a-r-y,

4    G-f-e-l-l-e-r.

5                        GARY GFELLER,

6          called as a witness, being first sworn,

7            was examined and testified as follows:

8                     DIRECT EXAMINATION

9    BY MR. CALL:

10        Q.     Thank you, Gary.  May I call you Gary?

11        A.     Yes, you may.

12        Q.     Okay, Gary.  What is your position with

13   the court?

14        A.     I am the chief deputy, and I'm also the

15   acting IT manager.

16        Q.     Okay.  And how long have you been doing

17   that?

18        A.     In this court I have been doing that since

19   November 30th of 2015.

20        Q.     And before that did you do something

21   similar with a different court?

22        A.     Yes.  I've had -- I've been with the

23   courts -- U.S. courts, and particularly in the

24   bankruptcy courts, for about 27 years.

25                   Before this I was the -- a little over



```
 1   three years as a clerk of court in the Connecticut
 2   bankruptcy court.
 3              Prior to that was the IT manager with
 4   primary responsibility for the ECF system and the --
 5   and its predecessor.  That was 15 years in there.
 6              And then I was -- spent five years in the
 7   Ohio northern bankruptcy as the IT manager for that
 8   court.
 9      Q.    So in preparing for your testimony today,
10   have you spoken to anyone about what you would be
11   testifying to?
12      A.    No.
13      Q.    Okay.  So no conversations with Russell or
14   with Janene or with Gloria?
15      A.    I've talked to them a little bit about
16   certain things, yes.
17      Q.    Regarding this case?
18      A.    Yes.
19      Q.    Okay.  And when did those conversations
20   occur?
21      A.    So they've occurred this morning.  They
22   occurred after noon.  They occurred even before this.
23   I mean, we've talked about this -- the issue since we
24   had the meeting a couple weeks ago.
25      Q.    Okay.  So since we had the meeting you've
```



1   spoken with -- with Janene -- with Janene?

2        A.    Janene, Russ, yeah.

3        Q.    And with Russ.  Did you speak with Gloria?

4        A.    No.  And it's primarily because these

5   folks are the ones who actually are dealing with the

6   IT -- background of the information, the training

7   stuff and things like that.  That's the area I'm

8   responsible for --

9        Q.    Okay.

10        A.    -- for the court.  So I need to make sure

11   that they are -- we are all on the same page in terms

12   of other issues that come up coming down the road.

13   So I'm making sure that the system is operational for

14   the future uses.

15        Q.    Did you talk -- did you speak with them

16   about any of the particulars of this particular case?

17        A.    Yes, probably.

18        Q.    And did some -- and some of those

19   conversations occurred this morning, you say?

20        A.    Yes.

21        Q.    And do you recall what the subjects were

22   of those conversations?

23        A.    Mostly the -- what I have determined, some

24   of the issues -- 'cause one of the things that I'm

25   responsible for is to -- making sure the system is up



1    and running, and so I want to make sure that I can

2    understand why things happened the way they happened

3    and what the screens look like.  So from that

4    perspective, I show them what I was able to determine

5    in the system.

6         Q.    So after this proceeding began you met

7    with the other witnesses and explained to them the

8    proceedings that were before this court?

9         A.    Not -- not exactly.  So I -- this morning

10   I did some testing on the system to see how I can

11   replicate some of the things that occurred here.  So

12   as a (indistinguishable).

13        Q.    And what, specifically, did you try to

14   replicate?

15        A.    So I tried to replicate the -- or I

16   already knew about the issue with the demand.  I

17   tried to replicate the issue with the transaction

18   log, and I was able to replicate that.

19             And it's also something that we discussed

20   a couple weeks ago, and I was just confirming what I

21   already told you back then and what we already --

22   already discussed at that meeting.

23        Q.    When you say "we discussed," you are

24   referring to when counsel met with you?

25        A.    Yes.



1        Q.    Okay.

2        A.    And our group.

3        Q.    And your group.

4              So you -- but -- but my understanding is,

5    is that you went through those -- that information

6    prior to our meeting and that you had made no -- you

7    had kind of looked at this issue then, before we

8    discussed.

9        A.    No.  So at that original meeting that we

10   had a couple of weeks ago, that was the first time

11   that we had discussed that, the first time I saw any

12   of these things that were being discussed about

13   today.

14             And at that point, during that meeting, I

15   actually got on the system and looked at a couple

16   things to determine.  In fact, I already knew some of

17   the answers.  I actually dis -- gave you a lot of the

18   answers there at that meeting.  And then I just

19   verified that on the system during that meeting.

20             And the one thing I did not verify was the

21   transaction log entry, which I have verified this

22   morning.

23       Q.    Okay.  So -- so were you given information

24   from the other witnesses or were you speaking --

25             THE COURT:  So, Mr. Call, I'm not sure



1   what it is you're trying to establish here.  Are

2   you -- I think Mr. -- I think I sense what you're

3   trying to suggest, that these people have gotten

4   together and discussed what they're going to testify

5   to as opposed to what the problem was.

6                MR. CALL:  Right.

7                THE COURT:  And so what you're trying to

8   suggest is that these three people sat down, got

9   together and said, This is how we're going to

10  testify.

11               MR. CALL:  No, I -- I don't believe that.

12  I just -- I'm just curious as to why they would meet

13  after the proceeding commenced and why he would be

14  running tests immediately prior to the hearing.

15               THE COURT:  You're seriously curious about

16  that?  I know why.  Everybody knows why.  I'm going

17  to take a recess.

18               THE CLERK:  All arise.

19               (Recess taken.)

20               THE CLERK:  Court resumes in session.

21  Please be seated.

22               THE COURT:  So, Mr. Call, the court

23  employees that you called as witnesses, they all have

24  different responsibilities with respect to CM/ECF.

25  And you contacted most of them personally after this



1   issue.  And it's -- would only be expected that they

2   would talk to each other about the issue that you

3   were discussing and complaining about, and them

4   trying to understand the issue that you complained

5   about.

6              MR. CALL:  Right.

7              THE COURT:  And so what I had an issue

8   with with the line of questioning that you started to

9   pursue and continue to pursue is the suggestion that

10  they were suggesting to each other how they were

11  going to testify as opposed to were they discussing

12  the problem and what was the problem that they saw.

13             MR. CALL:  Yeah.  And I didn't have a

14  problem with them discussing the problem after we met

15  with them a month ago, it's just I didn't anticipate

16  that the witnesses -- I mean, I didn't exclude them

17  from -- from these proceedings because I know that

18  they're under the administration of your Honor, but I

19  just didn't expect that the witnesses would -- would

20  meet and discuss testimony between them during the

21  course of the proceedings.

22             THE COURT:  You didn't ask them if they

23  had discussed testimony, and that was -- that wasn't

24  the question you were asking him, but that was the

25  inferences from the questions that you were asking



1    him, and that was the problem that I have had.

2              MR. CALL:  Okay.

3              THE COURT:  So if you want to be more

4    direct and ask Mr. Gfeller that question, I don't

5    have any problem with that.

6              MR. CALL:  Okay.

7         Q.    So, Gary, as the Court has indicated, did

8    you have a discussion with any of the other

9    witnesses, Gloria, Janene or Russell, concerning

10   testimony that had been given or that would be given?

11        A.    No.

12        Q.    Okay.  So you -- you have quite a bit of

13   experience with the -- with the filing software,

14   correct?

15        A.    I consider myself a subject matter expert

16   on the idea -- on the issue.

17        Q.    Okay.  And -- and what is the -- is it

18   called -- what -- how do you refer to it?  The ECF

19   system?

20        A.    We refer to it as the case management,

21   electronic case filing system, or CM/ECF.

22        Q.    Okay.  And for our -- for my brief

23   questions we'll just call it the filing system.

24   Would that be okay?

25        A.    Very good.



1        Q.      Okay.  So the filing system, does it

2    capture and maintain certain statistical data in

3    connection with a filing?

4        A.      Yes.

5        Q.      And what information is captured?

6        A.      Basically what you see on the transaction

7    log is some of the information that gets captured.

8        Q.      Does it capture the date that the filer

9    logs in?

10       A.      No, it does not.

11       Q.      Okay.  Does it capture the -- any

12   attempted filings of documents?

13       A.      No, it does not.

14       Q.      Okay.  So it's -- if a user attempted to

15   file a complaint in an adversary proceeding a number

16   of times, but was unsuccessful, is it accurate -- is

17   it correct to state that the system would not store

18   those attempted filings?

19       A.      Probably not.

20       Q.      So you can't determine from the filing

21   system software the number of attempted filings that

22   were made in -- in this particular case?

23       A.      No, I cannot.

24       Q.      You don't have a dispute that there was

25   prompt notice given to you and others about the



```
 1   filing problem on April 23rd, do you?
 2        A.    I don't understand the question.
 3        Q.    Were you aware -- was -- were you advised
 4   or informed via a call or a communication with Janene
 5   or with Russell or with myself that there had been a
 6   problem on the 22nd in an attempted filing?
 7        A.    Not on the 22nd.  It was almost midnight.
 8   So no, not on the 22nd.
 9        Q.    I meant -- I'm sorry -- on the 23rd.
10        A.    I had heard about it on the 23rd.
11        Q.    Okay.  And who -- how did you hear about
12   it?
13        A.    I don't recall.
14        Q.    In your role, do you work on the manual
15   for the filing system?
16        A.    I get involved in -- if we were going to
17   do a manual budget.  You also have to recognize that
18   we're on version 5 of ECF, 5.2.2.  That was -- last
19   major release was done ten years ago, and so there
20   really has been very minor changes to CM/ECF in the
21   last ten years because the concentration by the
22   Administrative Office of the U.S. Courts is on the
23   next gen version of CM/ECF, or the filing system.
24   But if we were to go into that, yes, I would be
25   involved in that.
```



1      Q.    Okay.  And then do you know the year of

2  the current filing manual?

3      A.    I do not.

4      Q.    So you don't know if it's prior to 2009 or

5  not?

6      A.    I do not.

7      Q.    Okay.  And you weren't involved when

8  Janene and the others kind of got together and were

9  making some suggested edits or revisions to the

10 manual?

11     A.    No, since I came here only -- since

12 2015 -- December of '15, so less than four years.

13     Q.    Oh, okay.  So there's been nothing in

14 regards to the manual -- revising or updating the

15 manual since that time?

16     A.    Correct.

17     Q.    And do you -- can you tell me what window

18 follows this window -- if you'll look at the --

19 what's been marked as the Bank's Exhibit 3, page 20?

20     A.    Yes.

21     Q.    Are you familiar with that screen?

22     A.    Yes.

23     Q.    Okay.  And can you tell me what -- what

24 screen follows that particular window?

25     A.    Sure.  I have a copy of it right with me.



1      Q.      Okay.

2      A.      It's a display message.

3      Q.      And what does it display?

4      A.      "Please note, filing this adversary is not

5   construed as an automatic notice of appearance and

6   request for notice in the related main case.  To

7   ensure a notice in that main case, you may wish to

8   file a pleading in that case."

9      Q.      Okay.

10      A.      And it gives you a Next or a Clear button.

11      Q.      Okay.  Do you know, in the process of the

12   filing, where the Pay.gov window arises?

13      A.      Yes, I know where -- where it arises.

14      Q.      And where does it arise?

15      A.      At the very end of the transaction.  After

16   you receive your notice of electronic filing, that's

17   when you receive notification of payment, if a

18   payment is due.

19      Q.      Okay.

20      A.      And you'll get a window that basically

21   says either pay now or continue filing.

22      Q.      Okay.  So in this case would you agree

23   that if a user could not get past this window that --

24   that there wouldn't be -- for whatever reason, just

25   assuming that that window -- at that stage it was



1    frozen and the user couldn't get past that window --

2    then you would agree that there wouldn't be a method

3    to complete the filing.  Is that correct?

4         A.    If that happened, I would say yes, you

5    probably couldn't complete the filing if you couldn't

6    get past that, but it seems very unreal --

7    unrealistic, because it's just a Next button.

8         Q.    Okay.  But if you hit the Next button and

9    nothing happened, or if you received an error, you

10   agree that you couldn't complete the filing?

11        A.    Yes, I would agree.

12        Q.    Okay.  And you would agree that you

13   couldn't complete the payment at that time?

14        A.    You can never complete the payment until

15   the end of the transaction, until the notice of

16   electronic filing has been completed.  So you never

17   pay prior to the end of that.  And it's been like

18   that since 2001 when this court received the filing

19   system and when I implemented it in Vermont in 2001,

20   so...

21        Q.    Okay.  And so if the filing is completed,

22   then should a filer be able to -- to pay?

23        A.    Yes, they should be able to pay at that

24   point.  Or they cannot pay.  They don't have to pay.

25   So the system gives you the ability to pay now or to



1    continue filing.

2          Q.    Okay.  So --

3          A.    And if you don't get the screen, it's not

4    a big deal either, because what constitute filing is

5    the date and time on the notice of electronic filing.

6          Q.    Right.  But your understanding is, is that

7    once the filing is complete, the filer would be --

8    would be given the opportunity to pay at that time?

9          A.    That is correct.

10         Q.    And so have you had issues with -- did

11   you -- you heard Mr. Jones' testimony concerning that

12   Pay.gov is different software?

13         A.    Correct, it is.

14         Q.    It is, correct?

15         A.    Yes.

16         Q.    Okay.  And, in fact, to make the payment,

17   isn't it true that you have to -- you have to be --

18   the filer has to be taken to the Pay.gov -- what

19   would you call it, switch, in order to make the --

20         A.    It's the Pay.gov site, yes.

21         Q.    Site.  But doesn't that arise

22   automatically after a filer has completed the filing?

23         A.    It can.  You get a window when you opt to

24   go to Pay.gov to pay now or you opt to wait until the

25   end of the day, for instance, and do all your


CITICOURT
THE REPORTING GROUP

1   things -- all your payments at once.

2        Q.    Right.

3        A.    And it's ideally for people who do

4   multiple -- multiple filings in multiple

5   bankruptcies.

6        Q.    Right.  And isn't the -- and the prior

7   window has a -- a provision that allows a filer to --

8   if it's the trustee or if it's a debtor, to -- to be

9   exempt from paying a filing fee, correct?

10       A.    That is correct.

11       Q.    But other users are required to pay the

12  fee, are they not?

13       A.    Correct.

14       Q.    Okay.  And so if -- if, in fact, the

15  filing wasn't complete, it's my understanding from

16  your testimony that the window to make payment would

17  not arise.

18       A.    If you don't get to the notice of

19  electronic filing, then you have not completed the

20  transaction.  And if you don't get to that, you will

21  not get to the Pay.gov screen.

22       Q.    Okay.  And in this particular case the --

23  the Pay.gov screen arose the next morning at our

24  office.  Do you have -- and then that -- I think you

25  heard the testimony from Janene that my paralegal

1    coordinated with her once that arose and made that

2    payment?

3         A.    Yes.

4         Q.    Do you have an understanding if, in fact,

5    there -- there wasn't a problem with the filing, why

6    the Pay.gov window would not have opened up until the

7    following day?

8         A.    I have no idea why that might happen.  It

9    seems unlikely.

10        Q.    It would be abnormal, wouldn't it?

11        A.    That is correct.

12        Q.    Now, Gary, let me show you what's been

13   marked as Exhibit 14.  It is entitled Transaction

14   Log.  You're familiar with that --

15        A.    Yes.

16        Q.    -- report, are you not?

17        A.    I am.

18        Q.    And can you just real quickly tell us what

19   that report shows?

20        A.    I think it's been described.  It's just

21   basically a ID of all the transactions that occur in

22   the -- in the filing system.

23        Q.    And then this other Exhibit 11 that's

24   entitled Case Report, has it been accurately

25   described?



1      A.    It's a report, yes.

2      Q.    Okay.  And I believe when -- when we met

3  and I discussed this with you and Mr. Jones that --

4  do you recall that you both indicated that we had a

5  discussion concerning this box?  And let the record

6  reflect that counsel is referring to Exhibit 11, the

7  center column -- row -- the sixth row --

8      A.    No.

9      Q.    Oh, I'm sorry.  The center row, sixth

10  column --  matrix Algebra was never my thing.  So do

11  you recall the discussion we had regarding the dates

12  in that box?

13      A.    Yes.

14      Q.    And do you recall that both you and -- and

15  Mr. Jones indicated that you had never -- had never

16  before seen an entry like that?

17      A.    I don't think I said that.  I think I said

18  it's unusual to see that, and I wanted to find out

19  why that was.

20           And then I remembered and -- before we

21  even looked into the system -- that I said that

22  oftentimes when a filing is -- is started before

23  midnight but completed after midnight there can be

24  anomalies like that showing up in the system.  And,

25  in fact, that's, in fact, what happened.  And, in

1    fact, there are several modification requests either

2    been completed or pending with regards to the filing

3    system that reflect this same kind of issue.  So this

4    is not unusual.

5        Q.    Okay.  So based on that -- that entry,

6    then, you would indicate that yes, there was activity

7    on April 22nd?

8        A.    Sure.  Absolutely.  And the way the system

9    works, it creates a context file.  And that context

10   file captures a lot of information when you first

11   start the transaction.  And then when you finish the

12   transaction, it takes some of that information and

13   completes and fills in the rest of the database with

14   the information it needs.

15            And, obviously, this is one of those

16   situations where the information was incorrect, and a

17   modification request should probably be written up,

18   but chances are this is such a minor thing that --

19   many of the modification requests with regards to

20   this type of issue have been around since 2008, 2011,

21   have never been accomplished, because there are much

22   more important modifications that the administrative

23   office and the courts, in general, want to get done

24   first.

25       Q.    I see.  All right.



1    THE COURT:  I might be a little confused

2    on the testimony.  I thought the testimony that you

3    just gave, Mr. Gfeller, suggests that you know -- or

4    can find out when a user enters the system and

5    completes a filing.

6              THE WITNESS:  I can tell when -- based on

7    this, I know that the -- that the context file

8    creates and -- and fills in data into the database.

9              There is not a physical record -- I mean,

10   we do have a record of -- in the database.  There's a

11   field -- or a table called Users which identifies

12   when you log in -- when the last time you log in so

13   we know when people log into the system.  So, from

14   that perspective, we know certain things about that.

15   That's not from the log files, which what we were

16   talk about.

17             THE COURT:  Okay.  So not from the files

18   that Mr. Call was asking you about, you can't

19   determine when a user is on and off the system, but

20   you do have that information available in the

21   database?

22             THE WITNESS:  Yes, there is a table in the

23   database that can identify that information.

24             THE COURT:  Okay.

25        Q.   (BY MR. CALL)  Okay.  Okay.  And if -- to



1    just further clarify the testimony that you gave, my

2    understanding is, is that -- and I think you said it

3    pretty well and -- and pretty specifically, but there

4    was clearly activity on the -- on the system -- the

5    file system.

6         A.    Sure, and -- and we've already established

7    that you were logged into the system shortly after

8    11:39.  In fact, we know the exact time was something

9    -- 11:42 or something like that.  So we know you

10   logged onto the system.  We know you restarted the

11   transaction, so...

12        Q.    Okay.  Okay.  Thank you.  So can you look

13   over this Exhibit 14?

14        A.    Yes.

15        Q.    Okay.  And -- so just going to the far

16   right there, just to hurry this along --

17        A.    Sure.

18        Q.    -- it's -- again, you've heard it said.

19   It says this is a temporary log-entry to handle

20   timing issues with docketing the same event many

21   times.

22             Is that -- is that kind of what you've

23   previously testified to, that you're talking about

24   that there are -- or let me not put words in your

25   mouth.  Do you want to explain --

CITICOURT
THE REPORTING GROUP

1      A.    Sure.  Actually, I --

2      Q.    Let me first interrupt you and ask, have

3  you seen that entry before?

4      A.    Yes, I have.

5      Q.    Okay.

6      A.    So -- and I actually did some testing to

7  make sure that I could replicate that problem.

8      Q.    Okay.

9      A.    And the way you replicate that problem is

10  that at the end of the transaction, when you get to

11  the notice of electronic filing screen -- and in the

12  case of an outside attorney you also see the Pay.gov

13  screen.  If you go and hit the Back button, you go

14  right back to the original screen that gives you the

15  information about ready to file and -- and accept

16  that -- submit that transmission.

17          If you do that, and you do that a couple

18  of times, you get exactly that message.  And I

19  replicated -- I created three new cases this morning

20  in our training database.  I replicated that exact

21  same process, and in every case I created that entry

22  in the log entry.

23      Q.    So that entry reflects multiple efforts to

24  complete.

25      A.    And that seems to indicate -- and that



1    seems in con -- in -- in reliance to what you had

2    actually talked about when we first met a couple

3    weeks ago, that you had kept going back and forth and

4    back and forth, and it makes sense.  And, in fact, I

5    had assumed that that's what was the issue, I just

6    hadn't validated it, and I validated it this morning.

7         Q.    Okay.

8         A.    And so, yes, it's pretty clear it's --

9    it's -- that's the reason why.

10        Q.    Okay.  Just -- last question.  Do you know

11   when the adversary proceeding opens?

12        A.    Yes.

13        Q.    Does it open simultaneously with the

14   filing of the Complaint?

15        A.    So it is the filing of the Complaint that

16   creates the adversary proceeding.  So it is when the

17   adver -- the Complaint is filed, date and time -- and

18   it's the date and time on the electronic -- and the

19   notice of electronic filing for the Complaint that

20   determines when the adversary is actually opened.

21        Q.    Okay.  So on the one window that had Pay

22   Next, would the adversary typically (counsel stepped

23   away from mic.)

24        A.    Absolutely not.  It has to go through

25   several more screens before you get to the notice of



1    electronic filing.  When you see the notice of

2    electronic filing -- and as an attorney, typically,

3    the Pay.gov screen -- that's when you know the

4    transaction has been accepted by the court and is

5    truly filed with the court.

6         Q.    Okay.  So simultaneous -- complaint

7    adversary happens simultaneously -- or it opens --

8    the adversary opens simultaneously with the

9    Complaint, correct?

10        A.    Sure.  I mean, the idea is you can't --

11   the case gets created first, but it's in the same

12   exact instance that the Complaint -- first entry gets

13   created as well.  You have to have the case, the

14   adversary proceeding, before you can put the first

15   entry in.  That's the way the database works.

16        Q.    And then isn't it accurate that it also

17   generates a summons and a notice of -- of the

18   issuance of the summons?

19        A.    Yes.  The issuance of the summons is an

20   automatic process that happens at the end of the --

21   at the end of the docketing of the Complaint.  So

22   once the Complaint's filed, the system automatically

23   generates a summons.

24        Q.    Okay.  So going back to that exhibit...

25        A.    Yes.



1      Q.     Sorry.  Let me just, for the record,

2   indicate, Exhibit 14 -- so it -- it indicates --

3   it -- there's the log entry that we were referring to

4   on row three, and then it indicates that there was

5   a -- an open new adversary case notice and then also

6   a summons that was generated, correct?

7      A.     Correct.

8             MR. CALL:  Okay.  Okay.  Gary, thank

9   you --

10            THE WITNESS:  You're welcome.

11            MR. CALL:  -- for your testimony.

12                    CROSS-EXAMINATION

13  BY MR. MORRISON:

14     Q.     Okay.  I think you testified that we can

15  tell precisely when Mr. Call logged into the system

16  on April 22nd, 2019, to start the process of filing

17  the Adversary Complaint in this case.

18            Do you have that information available to

19  you and -- just with what you brought with you to

20  court today?

21     A.     I did not bring that with me, but I

22  remember I was looking at that information at our

23  previous meeting.

24     Q.     Okay.  Do you have information on whether

25  Mr. Call logged out during this filing and then



1   logged back in?

2        A.    I do not have that information, but we

3   can -- we could check that.  But I don't believe that

4   when we checked that that happened.

5        Q.    Okay.  How hard would it be -- that be to

6   get that information for us?

7        A.    We would have to do a search of the

8   database, just a query of the database.

9        Q.    If we were to take a short recess, how

10  much time would you need to get that?

11       A.    Five minutes.

12            MR. MORRISON:  Is that okay, your Honor?

13            THE COURT:  I thought I was going to get

14  that.  Based on the discussions we had at our

15  pretrial hearings, I thought that was going to be

16  information.  So I'll take a brief recess.

17            MR. MORRISON:  Thank you.

18            THE CLERK:  All arise.

19            (Recess taken.)

20            THE CLERK:  Court resumes in session.

21  Please be seated.

22            THE COURT:  All right.

23            MR. MORRISON:  Okay to proceed?

24            THE COURT:  Yes.

25            MR. MORRISON:  All right.  Thank you, your



1    Honor.

2              We have stipulated that Exhibits 16 and 17

3    from yesterday may be received into evidence.

4              And then also we have identified with

5    Mr. Gfeller an exhibit that we've marked as

6    Exhibit 18 that we have all -- counsel have also

7    stipulated may be received into evidence, and we'll

8    be talking about that exhibit in just a moment.

9              THE COURT:  Well, why don't we maybe lay

10   some foundation just for my benefit.

11             MR. MORRISON:  Sure.

12             THE COURT:  Maybe Mr. Gfeller could

13   explain how this is generated, what it was generated

14   from and what it shows.

15        Q.    (BY MR. MORRISON)  Would you be able to do

16   that for us?

17        A.    Yes, I can.

18             So whenever somebody logs into the system,

19   it gets logged into the log-in table of our database.

20   And there are three fields, and specifically that we

21   were looking at is the date of when the log-in

22   occurs, the IP address of machine and the person's ID

23   record.  So that's -- in this case 1544 is for the ID

24   associated to attorney Steven Call.

25        Q.    Thank you.



1           THE COURT:  Thank you.

2           THE WITNESS:  And -- and the other thing

3  that this identifies is only when somebody logs in.

4  It does not identify when somebody logs out.  So if

5  somebody does log out, the next time they log in will

6  be identified in the database and, therefore, can be

7  extracted in a report like this.

8       Q.     (BY MR. MORRISON)  So, in other words, we

9  can tell if somebody's logged out and logged --

10  logged back in because there would be multiple

11  entries indicating that?

12       A.     Correct.

13       Q.     All right.  Very good.  And you -- I

14  believe you testified that the PRID, which shows up

15  on Exhibit 18, the PRID is the personal

16  identification number?

17       A.     Yeah, the person ID, yes.

18       Q.     And the identification number on

19  Exhibit 18 is 1544, which you have been able to link

20  to Mr. Call?

21       A.     Correct.

22       Q.     Okay.  So does Exhibit 18 establish when

23  Mr. Call logged into the electronic filing service on

24  April 22nd of 2019?

25       A.     Yes.  It's at 23:40:45.



1          Q.     And another way to say that time would be
2     11:40:45 seconds on the clock?
3          A.     Correct.
4          Q.     P.m.?
5          A.     P.m., yeah.  11:00 p.m.
6          Q.     Okay.  Thank you.
7                 And we don't see that he logged back in
8     until when, according to Exhibit 18?
9          A.     Until the next morning around 8:57 a.m.
10         Q.     So by that we can tell that his log-in on
11    April 22nd was continuous until he logged out
12    until we see the next entry?
13         A.     Correct.  I mean, we know, based upon the
14    transaction log, that he was on at least until 16
15    minutes and 48 seconds past midnight.  How long he
16    stayed on after that we don't have a record.
17         Q.     Okay.  And that reference to the
18    16 minutes past midnight was the reference to the
19    filing of the Adversary Complaint in this case,
20    correct?
21         A.     Right, on Exhibit 14.
22         Q.     Okay.  Thank you.
23                THE COURT:  All right.  So just to make
24    sure I understand, Mr. Gfeller; we don't know -- we
25    know Mr. Call logged in April 22nd at 11:40:45 p.m.

